## JEFF RIPPEY v. THE STATE.

### *No. 7055.   Decided June 21.*

1.   **Practice.**—Pending further proceedings in the case, after the jury was impaneled, the trial court, over the defendant's objection, permitted the clerk to supply an omission by endorsing his file mark on the indictment. *Held,* correct.

2.   **Same—Jury Law.**—In the organization of the trial jury in a capital case each juror as selected is sworn and impaneled, and when thus sworn and impaneled a juror can not be excused or discharged without the consent of the defendant, unless the entire panel is also discharged.   But the rule is different in a felony case less than capital. In such case the jury is impaneled only when it is complete in number and sworn as a body.   Seven jurors were selected on the first day of this trial, and the court then adjourned for the day to enable the sheriff to summon talesmen.   As matter of precaution the court had the regular oath administered to the seven jurors selected, and they were placed in charge of an officer.   At the opening of court on the next day one of the said seven was reported too ill for service, and without the consent of defendant he was discharged.   The defendant then moved to discharge the remaining six jurors and continue the case, the motion being based upon the ground that after a person is once sworn as a juror he can not be discharged unless the whole jury is also discharged. *Held,* that the case not being capital, the motion was properly overruled.

3.   **Same.**—That an objectionable juror was impaneled and sat upon the jury after the defendant had exhausted his peremptory challeges is not an exception sufficient to raise in the appellate court the question of the juror's status.

4.   **Same—Impeaching Testimony.**—It is no longer an open question that a witness may be impeached by showing that he made statements before the grand jury contradictory of his evidence on the trial.

5.   **Same—Evidence.**—On a trial for assault with intent to murder the prosecuting witness, over the objection of the defense, was permitted to testify that he gave a description of his assailant to the parties who went in pursuit after the assailant fled. *Held,* that the testimony was competent.

6.   **Same.**—Over the objections of the defendant a State's witness was permitted to testify that foot tracks found at the place of the shooting corresponded with the feet of the defendant, and that horse tracks found at the same place corresponded with the feet of a horse belonging to B., with whom defendant was staying, and that in his opinion the defendant and the said horse made the tracks described. *Held,* correct.

7.   **Same.**—It was the theory of the State that the defendant shot the injured party because he suspected the latter of causing poison to be administered to his dogs.   The defense objected that in connection with other evidence on this issue it offered evidence to disprove the imputed motive, which was excluded by the court.   The record, however, does not sustain this exception, inasmuch as it not only shows no such ruling by the trial court, but shows that no restriction was placed upon the testimony in reference to the dog matter, and that the witnesses testified fully upon that subject.

8.   **Same.**—To the competency of the witness F. to testify on this trial the defense objected that he was not sworn with the other witnesses and formally placed with them under the rule at the beginning of the trial.   It is shown, however, that F. was actually under the rule throughout the trial, and that when placed upon the stand the oath was administered to him. *Held,* that the objection of the defense was properly overruled.

9.   **Same—Charge of the Court.**—The trial court having given at the request of the defense a correct special instruction upon the law of circumstantial evidence, such instruction must be held to have cured whatever of error was embraced in the general charge on that subject.

APPEAL from the District Court of Hopkins.  Tried below before Hon.
E. W. Terhune.

This conviction was for an assault with intent to murder Ben McGill.
The penalty assessed by the verdict was a term of three years in the peni-
tentiary.

The identity of the defendant as the party who fired upon and shot Ben
McGill was the disputed issue in this case.  McGill lived at Reiley Springs,
in Hopkins County, about ten miles distant from the town of Sulphur
Springs.  It was testified, and was not controverted, that he was called
to his front gallery between the hours of 3 and 4 o'clock on the morning
of January 11, 1890, and immediately shot by some person from a point
near the front gate of the yard.  The distance between the front gate and
the gallery was about forty feet.  Eleven buckshot pierced his body, in-
flicting wounds which confined him to his bed for six weeks.

Ben McGill testified for the State that between 3 and 4 o'clock on the
morning of January 11, 1890, he was awakened by some person calling
"Halloa" at the front gate.  At the second call the witness got up and
went to the front door and replied, "Halloa, yourself."  The person,
whom witness could not then see, said that he wanted directions to the
house of Joe Stribling.  Witness then stepped through the door to the
gallery.  As he did so the person passed from the east to the west side of
the gate, asked "Is that you, Ben McGill?" raised a shot gun to his shoul-
der and, about the time witness responded "Yes," fired, and inflicted the
wounds upon the witness's person.  At that time the witness did not know
Jeff Rippey, and had never seen him.  He could not at the time tell whether
the party was a white or black man, but he observed that he wore a white
hat with a broad and "flopping" brim, and a dark colored coat, from
which, at the place where the right pocket should be a piece of cloth had
been torn.  The moon was a little south of meridian at the time of the
shooting.  The night had been "showery," but no rain was then falling,
and the sky was then cloudless.

T. J. Walker was the first person to reach the witness's bedside on the
following day.  Colonel Weaver came next.  To Colonel Weaver the wit-
ness gave a description of the person who shot him, and he afterwards
repeated that description to the parties who went in search of the would-be
assassin.  On the next day the defendant was brought to the witness's
bedside.  He was then wearing a large broad-brimmed white hat similar
to that worn by the person who shot the witness, and a dark colored coat
with a hole on the right side where the pocket should be.  By that hat
and coat alone the witness positively identified the defendant as the man
who shot him on the preceding night.  Jim Barker's house, by way of
the main road, was about four miles distant from the witness's house.

J. A. Weaver testified for the State that in response to a message he
went to McGill's house on the morning of January 11, 1890, arriving at

ten minutes before 4 o'clock. He found McGill suffering from gunshot wounds. Mrs. McGill, Mr. Walker, and Dr. McElroy were present. McElroy was engaged removing balls or buckshot from McGill's person. Soon afterwards the witness went to the front fence of the yard to look for foot tracks. He found the tracks of at least three different persons. Two of them he took to be the tracks of Dr. McElroy and the boy who went after the doctor. The other was the track of a No. 7 or 8 shoe or boot, both heels run down to the right. The person who made that track left the gate in front of McGill's house on a dead run, crossed a chip pile and fled to a point about four hundred yards distant, where tracks showed a horse to have been hitched. Rain had fallen during the night and the tracks showed that the horse was at that place both before and after the rain. From this point the tracks of the horse were followed to the house of Jim Barker, four miles distant. The tracks showed that for the distance of three-quarters of a mile from where he was hitched the horse traveled at full speed. When the witness and Officer Ferguson reached Barker's house they found the defendant in the yard hitching horses to a wagon. The wagon contained a saddle and bridle. The bridle was wet, showing it to have been rained on during the night. The saddle was dry in the seat and down the middle of the sweat leathers, but elsewhere was wet. Defendant was then in his shirt sleeves and had on a large broad-brimmed white hat. A large bay horse claimed by Barker was found in the horse lot. Sweat marks on his back and head showed that he had experienced recent violent exercise. To the feet of this horse the witness carefully applied the weed measure made by him of the horse tracks near McGill's house and which led from McGill's house to Barker's house. He found by that measure that the tracks followed from McGill's to Barker's corresponded perfectly with the feet of the said horse. Ferguson then placed defendant and one Bob Blaylock, who was at Barker's house, under arrest, and it was observed that defendant wore a pair of boots the heels of which were run down to the right. Immediately after his arrest the defendant got his coat from somewhere about Barker's house. The coat was torn about the right hand pocket and was damp or moist about the shoulders. He said that he had left it out over night hanging on the wall of the house. Upon reaching the neighborhood of McGill's house the witness caused defendant to take off his right boot which he applied to two of the plainest of the run down tracks leading from the front gate to the place where the horse was tied. The boot fit the tracks perfectly. When he applied the boot to the first track the witness looked up into the defendant's face. Defendant "looked unmanned, as a man who had given down." The boots of the defendant were muddy. A single barreled shot gun was found in Barker's house. The State rested.

Walter Blaylock was the first witness for the defense. He testified, in substance, that Jim Barker's wife was his, witness's, sister. Witness lived

about a quarter of a mile from McGill's house, and as a rule visited Mc-
Gill's house every day.   He was at McGill's on Friday, the day preceding
the shooting.   He then had two of Jim Barker's horses with him, one of
them being the bay horse described by Weaver.   He was then taking that
horse to the school house, at which Mr. Barker was teaching school, for
Mr. Barker to ride home.   Afterwards he and Barker rode the horses to
Barker's house, arriving about sunset. · Soon afterwards defendant, Bob
Blaylock, Jim Bowen, and Sim Taylor, who had been hog hunting, reached
the house.   They had a wagon and saddle horses with them.   Defend-
ant's saddle and a dead hog were in the wagon.   After that all of the
parties named, except Sim Taylor, went to the Pond school house to at-
tend the exercises of a debating society.   Pond school house was about a
half mile distant from Barker's house.   Jim Barker's wife attended that
debate.   It was between 9 and 10 o'clock when the debate closed.   Wit-
ness then went home.   When defendant, Bowen, Taylor, and Bob Blay-
lock reached Barker's house on that evening something was said by some-
body about two dogs having been killed during the day, or having died
from poison.   Witness did not hear the defendant say anything about the
dogs.   One of the dogs belonged to defendant and one to Jim Barker.
The witness did not hear any one express an opinion as to who poisoned
the dogs.   When they reached Barker's house from the hog hunt on the
evening preceding the shooting of McGill the defendant and Bob Blay-
lock had 32-calibre rifles, Bowen a 22-calibre rifle, and Taylor a shot gun.

Sim Taylor testified for the defense, in substance, that he was on the
hog hunt with defendant, Bob Blaylock, and Bowen on the day preceding
the shooting of McGill.   The witness was the only man of that party armed
with a shot gun.   They killed one hog, and returned to Jim Barker's house
about dusk.   When they entered the house Barker asked the party what
luck they had hog hunting.   Bowen replied that the party had but poor
luck—killed one hog and lost two dogs by poison.   Barker asked defend-
ant if Bowen's statement was true, and defendant replied that it was.
The witness then remarked that he thought a certain old negro man ad-
ministered the poison to the dogs.   That old negro lived near McGill's
place, and it was in that neighborhood that the dogs got the poison.   If
McGill's name was mentioned in connection with the dogs the witness did
not know it. · Bob Blaylock did not say that McGill poisoned or caused
the dogs to be poisoned, or that he had previously poisoned dogs belong-
ing to him, Blaylock.   The witness went home after supper, taking his
shot gun with him, and did not attend the debate.

Bob Blaylock testified for the defense that he was one of the hog hunt-
ing party referred to by the witness Taylor.   When that party got back
to Jim Barker's house late on the evening preceding the shooting of Mc-
Gill, the death of the two dogs by poison was reported to Barker, and in
that connection one of the party remarked, "I wonder where they got

the poison?" Nothing else whatever was said about the dogs on that night. After supper Taylor went home, taking his shot gun with him. The horses, including the bay horse whose foot was measured by Colonel Weaver, were turned out of the lot on the common. The hog was then butchered. The several parties at Barker's then went to the debate, returning about 10 o'clock. They then played cards until about 12 o'clock. They then retired. Mr. and Mrs. Barker, witness, defendant, and Lindley all slept in the same room. Defendant was in bed when witness went to sleep, and was in bed when the witness got up the next morning. If he left the house after witness retired the witness did not know it. Defendant's saddle was left out over night exposed to the rain which fell. The bay horse described by the witness Weaver came up to the house early on the morning after he was turned out—that is, on the morning after the shooting of McGill. He was wet enough to show that he had been exposed to the rain of the night before. The witness and the defendant, before breakfast next morning, went to the field house, 400 yards distant from Barker's house, to get a pup. They traveled over wet ground. On their return defendant went with Barker to a well about 100 yards from the house. The ground about the well was very muddy.

This witness, on his cross-examination, denied that he and defendant or other parties entered into an agreement to investigate the dog matter, or that they had any particular or extended discussion of the same. To some person, whom witness could not now remember, he, witness, expressed his belief that Frank Robinson, a negro who lived near McGill's, poisoned the dogs. His opinion thus expressed was based upon the statement of Mr. Airhart that shortly before the dogs were poisoned Frank Robinson asked him if there were any hog hunters in the neighborhood.

Jim Bowen corroborated preceding defense witnesses as to what occurred at Barker's house upon the return of the hog hunting party. If defendant was mad he did not show it, and he said nothing whatever in the hearing of witness about the dog poisoning.

Jim Barker's testimony as a whole corroborated the testimony of preceding witnesses for the defense as to what transpired at his house on the night of and the morning after the shooting. Moreover it strongly supported the defense of alibi. He testified that defendant went to bed about 12 o'clock; that he, witness, went to bed in the same room at the same time; that after sleeping some time he, witness, woke up and stepped to the front gallery; that on his return to the room the defendant, then in bed, asked him if it was still raining, and then went to sleep again, and slept throughout the night. He denied that he testified before the grand jury, in effect, that he and defendant retired at 12 o'clock, and that he saw and knew nothing more of defendant until next morning. Mrs. Barker corroborated her husband, and stated that it was about ten minutes to 3 o'clock when her husband got out of bed and was

asked by the defendant if it had quit raining. She further declared that she was an exceedingly light sleeper, and that defendant could not have left the room after retiring without her knowing it. She denied that in her testimony before the grand jury she stated that nobody, or that her husband did not get up and go out of the room on that night after retiring.

Two members of the grand jury which presented this bill of indictment, testifying for the State as impeaching witnesses, stated that Jim Barker testified before the grand jury that he did not see or hear or know anything of the defendant after he went to bed on the night of the shooting. Mrs. Barker was then recalled by the grand jury, and in reply to a direct question testified that her husband did not get out of bed nor leave the room after retiring on the night of the shooting of McGill.

Two or more witnesses for the defense testified that at night recently before this trial they were called upon to observe the defendant attitudinize in the moonlight, the purpose of such observation being to determine whether they could distinguish a rent in a coat worn by him at the distance of forty feet. The several witnesses agreed that they could not see such a rent as that described by the prosecuting witness, though they particularly looked for it, at a greater distance than fifteen feet.

Testifying in his own behalf, the defendant declared that he did not leave Barker's house on the night of the shooting after he returned from the debate; that he did not know McGill; did not know where McGill lived; that he had no shot gun, and did not shoot McGill. He explained that his saddle and coat got wet by being left out of doors and exposed to the rain over night, and that he got his boots muddy by walking into the field and to the well on the morning after the shooting, before his arrest.

*E. B. Perkins* and *Harris & Blocker*, for appellant.

*W. L. Davidson*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—1. When the trial was about to begin, and after the jury had been impaneled, it was discovered that the clerk had neglected to endorse his file mark on the indictment. The district attorney moved the court to have the clerk to make the proper file mark endorsement upon it, and this was done by order of the court, over objection of defendant, as shown by his first bill of exceptions. The ruling of the court was correct. Caldwell v. The State, 5 Texas, 18; Willson's Crim. Stats., secs. 1942, 1943.

2. On the first day of the trial seven men were selected as jurors, and the court was adjourned until the next morning to enable the sheriff to procure talesmen from the country. As a matter of precaution the court had the regular jury oath administered to these seven jurors who had been

passed upon and selected by the parties, and they were then placed in charge of an officer. On the next morning one of these seven men was found to be so ill as to be unable to sit as a juror, and the court, without the defendant's consent, discharged him. Defendant's counsel then moved the court to discharge the jury, that is, the other six jurors, and continue the case, which motion was overruled and the jury filled out with the talesmen who had been summoned. Defendant, in his third bill of exceptions, states in connection with this matter that he exhausted his challenges and was compelled to take jurors who were not of his choice, but he states no reason why they were objectionable to him or why they were not fair and impartial jurors. The objection to this proceeding is that after a person has once been sworn as a juror in a case he can not be excused or discharged by the court unless the whole jury is also discharged. This is the rule in capital cases, it being required in such cases that as each juror is selected he shall be sworn as a juror to try the case. In other words, each juror selected is impaneled (Code Crim. Proc., art. 642; Willson's Crim. Stats., sec. 2290), and the court has no authority to excuse or discharge such juror without the defendant's consent. But this is not the rule where the case is a felony less than capital. In these latter cases a juror is not impaneled, that is, sworn as a juror to try the case, until the whole jury has been selected and sworn as a body. Code Crim. Proc., art. 657; Ellison v. The State, 12 Texas Ct. App., 557. The fact that, as matter of precaution, the court had had these seven men sworn as jurors to try the case did not relieve them of the necessity of again being sworn, as was done, when the entire jury had been selected; and though sworn, they were not in fact jurors in the case until the entire jury was selected and they with the others sworn in a body as a jury as provided in article 657, *supra.* Heskew v. The State, 17 Texas Ct. App., 161.

There is no error shown in the second and third bills of exception relating to the organization of the jury. "Merely that an 'objectionable juror' was impaneled and sat upon the jury after defendant exhausted his peremptory challenges, is not an exception sufficient to raise the question of the juror's status in this court." Hudson v. The State, 28 Texas Ct. App., 323.

3. Several of defendant's bills of exception relate to the rulings of the court in permitting his witnesses to be impeached by evidence showing that they had made before the grand jury, upon the investigation of the case by that body, statements contradictory of their testimony as given on the trial. That a witness can be so impeached is no longer an open question in this State. Clanton v. The State, 13 Texas Ct. App., 139; Scott v. The State, 23 Texas Ct. App., 521.

4. No error is disclosed by the fourth bill of exceptions. The witness McGill was permitted to state that he had described the man who shot him before the parties started in pursuit. What description he gave of

him is not stated in the bill.   The evidence was in every respect admissible as far as shown by the bill.

5.   The witness Weaver was permitted, over objections, to testify to a measurement and comparison of horse and boot tracks found and measured by him and compared with defendant's track and the track or hoof of a horse found at Barker's place, where defendant was staying and where he was arrested; and the said witness was allowed to state his opinion as to the similarity of said tracks.   This evidence was admissible and legitimate.   Thompson v. The State, 19 Texas Ct. App., 594, 595; Clark v. The State, 28 Texas Ct. App., 189; Garner v. The State, 28 Texas Ct. App., 561.

6.   No matter worthy of discussion is shown by the sixth bill of exception.

7 and 8.   The seventh and eighth bills of exceptions have already been discussed in connection with the third bill of exception concerning the impeachment of the witnesses by statements made by them before the grand jury.

9.   The statement of facts shows that the witnesses were permitted to testify fully to what was said and done by all the parties with reference to the poisoning of the dogs.   The ninth bill of exception was saved to the exclusion by the court of certain declarations or statements made by defendant to Bowen to the effect "that he did not know where the dogs could have gotten the poison."   In addition to the fact that the learned judge in certifying this bill says he has no recollection of such ruling, we find in Bowen's testimony that he swears that "after Bob and Rippey (defendant) came back I did not hear them say anything about the dogs."

10.   The tenth bill of exceptions also relates to the impeachment of the witness by contradictory statements made before the grand jury, and is fully answered in our discussion of the third bill, *supra*.

11.   The court's explanation appended to the eleventh bill of exception is entirely satisfactory, and shows that the defendant has no grounds for complaint, because though the witness Ferguson might not have been sworn with and at the same time the other witnesses were sworn and put under the rule, he was nevertheless under the rule with them, and was sworn when put upon the stand to testify as a witness.

12.   As qualified and explained by the court the twelfth bill of exceptions is without merit.   His explanation as to the only serious question involved shows that it was not and could not have been raised as is insisted was done by counsel for appellant.   He states that the stenographer's notes sustain his recollection, and the other facts stated by him are to our minds conclusive that counsel must be mistaken.   In the attitude in which the matter is presented in the record we must hold that no error was committed.

13.   If any objection to the charge of the court given upon circum-

stantial evidence was tenable it was fully met and cured by the defendant's special requested instruction upon that phase of the law, which the court gave.   Willson's Crim. Stats., sec. 2498.

We have found no reversible error in the record, and the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.